**STRAND et al. v. GARDEN VALLEY TELEPHONE CO.**

Civil Action No. 185.

District Court, D. Minnesota, Sixth Division.

Sept. 27, 1943.

O. E. Lewis, of Bagley, Minn., and Geo. A. Lewis, of Minneapolis, Minn., for plaintiffs.

O'Brien & Sylvestre, of Crookston, Minn., for defendant.

VOGEL, District Judge.

This is an action brought under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., to recover unpaid overtime wages, liquidated damages for failure to pay such wages, and reasonable attorneys' fees as provided for in the Act.

The plaintiffs are Agnes E. Strand, Lena M. Bakken and John P. Hanson. Originally there was a fourth plaintiff, Arnold S. Peterson, who dismissed his case during the trial.

The defendant, Garden Valley Telephone Company, is a co-operative association formed under the laws of the State of Minnesota. During the times covered by the complaint the defendant operated sixteen to eighteen telephone exchanges in the State of Minnesota, one of such exchanges being at Fosston, Minnesota. The defendant owned no property outside the State of Minnesota and its own lines did not cross state lines, but were wholly within the State of Minnesota. At all times covered by the complaint the defendant had more than five hundred stations or telephones, sometimes having in operation as high as four thousand five hundred telephones. It rendered service twenty-four hours each day. It maintained long distance telephone connections with the Northwestern Bell Telephone Company, whereby it offered to its customers long distance telephone service with points outside the State of Minnesota. On long distance telephone calls made over the defendant's lines to points outside defendant's territory, where such calls were collected for by the defendant, and on incoming "collect" calls from points outside the defendant's territory, the defendant received approximately one-third of the charge therefor. On calls made outside the defendant's territory and paid for at the point of origin, the defendant received no revenue. The defendant's gross earnings per year on interstate business was estimated by the defendant's manager at $3,100. The defendant had an agreement with the Western Union Telegraph Company whereby messages to be transmitted by Western Union telegram could be phoned to the defendant's operators, who would transmit the messages to the local Western Union operator to be sent to places outside the defendant's territory, including points outside the State of Minnesota. On such calls the defendant received commissions which averaged something in the neighborhood of $100 a year. The defendant's gross revenue from all sources for the years covered by the complaint ranged from $71,871.56 to $90,144.82. To summarize, the defendant is a Minnesota corporation operating a telephone business and owning property wholly within the State of Minnesota, but offering to its customers and to the public telephone and telegraph connections with any point in the United States, and presumably elsewhere. By such connections it has become an integral part of that vast network of telephone and telegraph communication over the entire country.

On April 10, 1942, a judgment was entered in this court in an action commenced by L. Metcalf Walling, as Administrator of the Wage and Hour Division, United States Department of Labor (hereafter referred to as the Administrator), against Garden Valley Telephone Company, a corporation, the defendant herein. Judgment in such action was entered pursuant to a stipulation entered into between the Administrator and the defendant whereby the defendant, without admitting the allegations of the complaint, consented to the entry of a judgment restraining the defendant from violating the provisions of the Fair Labor Standards Act of 1938, and providing, also, that the defendant would do and perform certain things set forth in said stipulation for the entry of judgment. The stipulation referred to provided that the defendant would pay to each of its employees employed

in or about its place of business at Erskine, Minnesota (home office of the Company), "A sum of money equal to the difference between the amounts of wages actually paid each such employee for the employment during the said periods and the amounts each such employee should have been paid had he been compensated for his said employment at the minimum and overtime rates of pay as required by Sections 6 and 7 of the Fair Labor Standards Act of 1938". The stipulation also provided that the defendant would compute the sums so due its employees and submit to the Administrator a schedule giving the names of the employees and the amounts due; that the Administrator could approve or disapprove the schedule submitted, and that such "schedule as approved by the plaintiff (if prepared by the defendant) or as prepared by the plaintiff or his representative, shall be final and binding upon the defendant as to the total and individual amounts due and the detailed items thereof." Such schedules were prepared, submitted to the Administrator, and, after an investigation by him, were changed and then approved and payments thereon were attempted. In the case of Strand the defendant sent to her by mail a check in the amount of $17.42, which the plaintiff retained but did not cash. She did not execute the receipt and the agreement or release which accompanied the check. In the case of the plaintiff Bakken the defendant offered her a check in the amount of $24.83 and received from her a receipt for $25.08, which stated on its face that it represented "unpaid wages computed or approved by the Wage and Hour Division under the provisions of the Fair Labor Standards Act of 1938, and covering the period or periods of employment from October, 1938, to November, 1941". The receipt was signed on May 16, 1942, by the plaintiff. In addition thereto the defendant required the said plaintiff to sign and the plaintiff did sign a release reciting a consideration of $25.08, whereby the plaintiff accepted the said amount "as full payment for any and all claims or wages due me under said Act and while in the employ of the Garden Valley Telephone Company". Such agreement is also dated May 16, 1942. The difference between the amounts of $25.08, as shown by the receipts, and the amount of the check, $24.83, represents a deduction in accordance with the Federal Insurance Contributions Act, 26 U.S.C.A. Int.Rev. Code, § 1400 et seq. This plaintiff did not cash the check, but has maintained it in her possession ever since. With reference to the plaintiff Hanson, he received a check from the defendant in the amount of $587.75 (added insurance deductions would have made the amount $593.69). This plaintiff also executed a receipt and agreement similar to those executed by the plaintiff Bakken. This plaintiff, also, did not cash the check of $587.75, but maintained it in his possession up to the time of trial. All of the aforementioned amounts were approved by the Administrator as the result of the stipulation and judgment in the case between the Administrator and the defendant.

The facts applying individually to the three claims will be given separate analysis as follows:

### Agnes E. Strand

The plaintiff Strand was employed by the defendant as chief switchboard operator at its exchange at Fosston, Minnesota. Her general hours of employment were from 8:00 A. M to 2:00 P. M., seven days per week. In addition thereto this plaintiff, by virtue of her position as chief operator, had to perform supervising duties, make out records and reports, and collect from users of telephones in the business section of Fosston. She performed the collection work for the defendant between October 24, 1938, and November 28, 1941. Subsequent to that date she was relieved of the collection work. Business telephones, for which this plaintiff had to make collection in the town of Fosston, averaged from fifty to sixty in number. There is considerable dispute in the testimony as to how much time this plaintiff was required to spend in performing her duties other than switchboard operating. It was claimed by the plaintiff that it was necessary for her to make approximately one hundred and fifteen to one hundred and twenty separate calls in order to make the collections. Collecting was done by the plaintiff between the first and seventeenth of each month. Where business men had a telephone at their residence as well as at their place of business, the plaintiff collected for both phones at the place of business, so that, in all, she took care of approximately one hundred and ten to one hundred and fifteen telephone bills. All of the places for collection were within approximately three blocks from the defendant's office. Plaintiff kept no records as to the amount of time the collecting or other work consumed.

In testifying she merely gave estimates of such time. Between the first and seventeenth of each month she believed she put in approximately twenty-one hours additional per week. After the seventeenth she testified that her additional work consumed approximately thirteen hours per week. There was some testimony to the effect that the work of chief operator, not including the collecting, would amount to one and one-half to two hours per week. A consideration of all of the testimony convinces me that, in addition to her regular forty-two hours per week spent at the switchboard, this plaintiff spent ten hours per week between the first and seventeenth of each month and for the balance of the month four hours additional each week, and I so find.

### Lena M. Bakken

This plaintiff was employed by the defendant during the period covered by the complaint as a night switchboard operator at the defendant's exchange at Fosston, Minnesota. She reported for duty at 9:00 P. M., remaining on duty until 8:00 A. M. the following morning, working seven days per week. She received no time off, excepting only such as she could obtain through getting a substitute or making exchanges with other operators. It is the claim of the defendant that between approximately 1:00 o'clock in the morning and 6:00 o'clock in the morning the plaintiff Bakken was able to sleep or rest, and that such resting hours should not be used in computing plaintiff's work hours. The testimony indicates that the defendant had in its exchange at Fosston a bedroom furnished for sleeping purposes, and for which it on its books charged its night operator room rent, and to which the night operator could retire during the hours when calls were infrequent, such as between 1:00 A. M. and 6:00 A. M. When the number of calls on the switchboard became infrequent, the night operator could switch on a night bell and then could retire to the sleeping room. Calls coming into the switchboard would automatically ring the night bell, thus attracting the night operator, who would get up and service the calls. During electrical storms and during periods when northern lights were prevalent, the night bell would ring constantly and it was necessary for the night operator to shut it off and remain at the switchboard all of the time. Such periods were substantial and frequent. Connected with the Fosston exchange there were twenty-eight farm lines, each one having from five to fifteen farm subscribers. Subscribers on the farm lines could call each other direct, but their calls rang through the Fosston exchange, so that when the night bell was on and any subscriber of a farm line called any other subscriber, the night bell would ring and it was necessary for the operator to get up and shut it off. Some nights were busier than others. At some seasons of the year the calls on the farm lines began at approximately 4:30 in the morning, thus necessitating the operator being at the board. During a period of several hours the operator could rest or "doze" or "relax", but the testimony does not indicate that the plaintiff was able to enjoy "several hours of uninterrupted sleep", or sleep for any substantial period. While there is some conflict in the testimony as to the number of night calls, it is apparent that they would average between four and five to a dozen calls per night during the hours in question. The testimony also indicates that the plaintiff resided at her father's home in Fosston, kept house for him, and that upon leaving her duties at 8:00 o'clock in the morning she returned to her home, did her housework, and slept in the afternoon for five or six hours so that she could be ready for duty at the defendant's switchboard at 9:00 o'clock, P. M. She had no use for the sleeping room for which she was charged by the defendant, excepting only such use as arose out of her duties as night operator. She had no number of consecutive hours of inactivity to conduct personal affairs or obtain normal sleep or repose. From the hour of 9:00 o'clock in the evening until 8:00 o'clock in the morning she was in actual service of the defendant, subject to call at any moment, never free to leave the exchange or sleeping room next to the exchange. Her situation is not comparable to that described in Interpretative Bulletin No. 13 of the Wage and Hour Division of the United States Department of Labor in July, 1939, referring to the employee of a small telephone exchange operating a switchboard located in the employee's house where the operator is able to obtain several hours of uninterrupted sleep every night. The Interpretative Bulletin states: "Thus, if over a period of several months a telephone operator has been called upon to answer only a few calls between the hours of 12 and 5 in the morning a segregation of such hours from hours worked will probably be justified". That is

not the case here. I find that she was on duty and engaged in the activities of her employment all of the time between the hours of 9:00 o'clock, P. M., and 8:00 o'clock, A. M.

### John P. Hanson

The facts with reference to the claim of this plaintiff were simplified by counsel through a stipulation entered into during the course of the trial, whereby it was agreed that if the Fair Labor Standards Act of 1938 was applicable the amount due the plaintiff for unpaid overtime compensation from October 24, 1938, to November 24, 1941, was $593.69. This plaintiff was employed by the defendant as a maintenance man. His duties consisted of helping to maintain the defendant's telephone lines as a "trouble shooter". The lines upon which he worked were the lines over which the interstate business of the defendant was conducted.

The defendant contends, first, that it is a service establishment coming within the provisions of Section 13(a), which reads as follows: "Sec. 13(a). The provisions of sections 6 and 7 shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *." 29 U.S.C.A. § 213(a) (2).

In its broad sense the term "service establishment" includes public utilities such as railroads, gas and electric companies, telephone and telegraph companies, and similar organizations. In its narrower sense the term is applicable to a different class of businesses such as hotels, garages, barber shops, laundries, tailor shops and the like. That the exemption clause to which I have just referred applies only to the latter class, or to the term in its narrower sense, is supported by: Stucker v. Roselle, D.C.Ky., 37 F.Supp. 864, 867; Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572, affirmed sub nomine A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 526, 62 S.Ct. 1116, 86 L.Ed. 1638, and Interpretative Bulletin No. 6 issued by the United States Department of Labor, Wage and Hour Division, in June, 1941. Interpretative Bulletins, such as the one referred to, are by no means binding upon the courts, but I believe they should be given consideration and that they do carry weight.

Attention is further directed to the fact that Congress in 29 U.S.C.A. § 213(a) (11) exempted "any switchboard operator employed in a public telephone exchange which has less than five hundred stations". It seems to me that the specific inclusion of switchboard operators of public telephone exchanges in the last quoted exemption negatives the possibility that Congress may have intended to include public telephone exchanges in its term "retail or service establishment" as used in 29 U.S.C.A. § 213(a) (2). I am further of the opinion that when Congress passed the exemption contained in 29 U.S.C.A. § 213(a) (11), exempting switchboard operators in public telephone exchanges which have less than five hundred stations, it was definitely indicating the scope of exemption as to the telephone industry, and that the employees of all other telephone exchanges engaged in interstate commerce, regardless of the amount, are covered by the Act.

I think it clear, therefore, that the defendant herein is not such "retail or service establishment" as was contemplated by Congress in passing the exemption quoted, and that this defendant does not come within the provisions thereof.

The defendant next raises the defense that it is not engaged in interstate commere, or that the amount of its interstate commerce is so relatively insignificant that it cannot be considered as being within the contemplation of the Act. Defendant's attorneys point out that the evidence showing the gross earnings of the defendant for each of the years 1938 to 1941, inclusive, show the earnings from interstate calls represented approximately four per cent, or less, of the defendant's gross earnings. In the first place, the amount of the employer's business in interstate commerce, or the percentage of income from interstate commerce as compared to gross income are not determinative of coverage under such situation as exists here. Under the Act the activities of the employees test coverage. The business of the employer is important only as it serves as a basis for showing the duties of the employees engaged in carrying it out. In the second place, Congress has given us no such test as claimed by the defendant, nor can I find any fair implication that it was intended that such a test should apply. This defendant was openly engaged in the handling of interstate calls. It of-

fered to the public a continuous service, twenty-four hours a day, whereby any member of the public could communicate with or receive calls from any point outside the State of Minnesota. The plaintiffs were engaged in handling all of such interstate business as was offered to the defendant. The fact that the income from such interstate business amounted to four per cent, or less, of the defendant's gross income is completely immaterial. This is not the case of an employer doing a fundamentally intrastate business having minor incidents of interstate commerce resulting therefrom. This defendant is directly and immediately engaged in the business of interstate communication, holding itself out to the public as such. It has become an integral part of our interstate communication system. The very nature of its business forces the conclusion that the employees whose activities make that business possible through the handling of interstate calls are engaged in interstate commerce and come within the meaning of the Act. In additional support of such view I have already pointed out that Congress in the exemption contained in 29 U.S.C.A. § 213(a) (11) has indicated the limit of exemption as to the telephone industry where interstate business is being handled. As the duties performed by the two switchboard operators are absolutely necessary to the consummation of the calls handled by the defendant in interstate commerce, and the handling of such calls was a regular part of their duties, they were engaged in interstate commerce.

The plaintiff Hanson in maintaining defendant's lines over which interstate calls were made was also engaged in interstate commerce. All three of the plaintiffs, in my opinion, come definitely within the meaning of the Fair Labor Standards Act.

The defendant challenges the sufficiency of the proof offered by the plaintiffs, and points out that the burden is upon the employee to prove every material fact of his case by a preponderance of definite, certain and convincing evidence. I am convinced from the evidence offered at the trial that the plaintiffs have sustained such burden to the extent herein indicated.

■ Defendant also resists the action on the ground that the plaintiffs have released and discharged the defendant from liability on the claim for which recovery is sought. An employee under the Fair Labor Standards Act of 1938 may not bargain away such

rights as are given by the Act. The right to damages for failure on the part of the employer to pay an employee the minimum wage is mandatory and does not become a matter of discretion for the courts, nor a matter of agreement between the parties. To hold otherwise would be an abortion of the intent of Congress, defeat in part the purposes for which the Act was passed, and open the way to injustice, if not to fraud.

■ Defendant contends that in such instances where settlements have been made, they are valid and binding if there was an actual dispute as to the number of hours worked, and such dispute was compromised by the parties.

With reference to the plaintiff Bakken there is no dispute as to the number of hours she put in on duty at the defendant's exchange. The only dispute arises in connection with whether or not the defendant should be given credit for the hours during which the telephone calls were few and she was able to retire to the sleeping room, arising only in answer to the night bell. The dispute is a legal one, not one of fact. There is no honest dispute between the plaintiff and the defendant as to the hours on duty, but merely as to the legal effect of a part of those hours. I have already stated my conclusion as to the effect of such hours. The plaintiff is held to have been on duty during such period. The plaintiff Bakken did not have the right under the law to compromise or settle for lesser benefits than the law provides. Such receipt and release or agreement as were executed by her do not bar recovery in this action.

■ As to the plaintiff Hanson no dispute arises as to hours of work, the parties having stipulated as to the amount of overtime wages to which he would be entitled in the event the Act applies to him. The present action is not barred by any compromise or attempt to compromise between the plaintiff and defendant.

■ Regarding the plaintiff Strand it is true I have found there was a dispute in the testimony as to the number of hours she worked in addition to the hours she spent at the switchboard. Had the plaintiff Strand and the representatives of the defendant gotten together, discussed their dispute as to such hours, and if they had agreed, the facts not being clear, that she had expended so many hours in her work, and it had been agreed that that was the fact, and there was no definite method of

ascertaining that such agreement did not represent the truth, then I think this defendant might have been able to settle or compromise such honest dispute, and that such compromise or settlement would have been binding. The facts with reference to such compromise or settlement must, however, be clear-cut and definite. There must be a final meeting of the minds upon the compromise, with a full understanding of the dispute and the effect of the compromise. The settlement must be as to the number of hours worked and thereafter must flow the full benefits as provided for by the Act, based on such hours. Such is not the situation here. In fact, the plaintiff Strand made no compromise or settlement. She refused to agree with the defendant's representatives as to the number of additional hours she was compelled to work. She refused to sign the release and agreement, although she did retain in her possession the check in the amount of $17.42 which the defendant's representatives forwarded to her by mail. I do not find in her retention of the check and failure to cash it such settlement of an honest dispute as might be binding upon her and a bar to this action.

With reference to the stipulation and judgment entered into in the case between the Administrator and this defendant, the plaintiffs in the instant action were not parties to that suit and are not bound thereby. The schedule of payments approved by the Administrator, and upon which the defendant attempted to make payments or effect settlements with the plaintiffs, is not binding upon the plaintiffs. The Administrator has no authority, under the Act or otherwise, to compromise the rights or benefits given to employees by the Act itself.

I, accordingly, hold that the plaintiffs have not released the defendant, and that the plaintiffs. all come within the meaning of the Fair Labor Standards Act of 1938, and as such are entitled to recover wages and an equal amount of liquidated damages.

In addition, the plaintiffs are entitled to recover a reasonable attorneys' fee. No evidence was offered before this Court with reference to the amount of attorneys' fees which should be allowed in the event of plaintiffs' recovery. The Court takes cognizance, however, of the time and effort that must necessarily have been expended in the preparation and trial of this case, including the argument of numerous motions prior to trial, the preparation of

interrogatories, et cetera, and fixes the attorneys' fees to be recovered by the plaintiffs at the sum of $750.

Plaintiffs' attorneys will prepare and submit proposed findings, conclusions and order for judgment in harmony herewith. Copy of proposed findings, conclusions and order are to be served upon the defendant's attorneys, who may have ten days after such service within which to make objections thereto.